UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In re:

STEPHEN VANDER HOFF,

Debtor.

_____/

Case No. DK 19-02977
Hon. Scott W. Dales
Chapter 12

MEMORANDUM OF DECISION AND ORDER

PRESENT:   HONORABLE SCOTT W. DALES
Chief United States Bankruptcy Judge

I.  INTRODUCTION

GreenStone Farm Credit Services FLCA and GreenStone Farm Credit ACA (collectively "GreenStone") filed three separate motions to dismiss the chapter 12 case of debtor Stephen Vander Hoff ("Debtor").  *See* ECF Nos. 56, 65, and 121 (collectively, the "Motions").  Because the Debtor contested the factual predicates for dismissal, the parties agreed to conduct an evidentiary hearing to consider the Motions before the confirmation hearing, which has been adjourned several times, in part due to the pending Motions and in part due to the pandemic.

The court held the hearing on the Motions in Grand Rapids, Michigan, on September 14, 2020.  The Debtor and GreenStone appeared, in the courtroom, through counsel; the chapter 12 trustee (the "Trustee") and counsel for the Internal Revenue Service (the "IRS") observed the hearing using the Zoom.gov application but did not participate. The United States Trustee neither observed nor participated in the hearing.

At the inception of the hearing, the parties agreed that the Debtor would bear the burden of proving his eligibility for relief under chapter 12, and that GreenStone would

have the burden of establishing "cause" to dismiss the case under 11 U.S.C. § 1208(c) and (d).[1]   Normally the court does not have the authority to consider converting a chapter 12 case to chapter 7 at the request of anyone other than a debtor, but because some of GreenStone's allegations suggested fraud in connection with the case (not just prepetition misconduct), conversion, as opposed to dismissal, is also at issue. *See* 11 U.S.C. §§ 109(f), 1208(c), and 1208(d).

The court heard testimony from the Debtor and Eric Krummen, GreenStone's credit officer.   GreenStone offered, and the court admitted, twenty exhibits mostly without objection; the Debtor did not offer a single exhibit or ask the court to take judicial notice of anything, but the court took judicial notice of the Debtor's petition, schedules, statements of financial affairs, and plan in accordance with the Order Regarding Judicial Notice dated September 23, 2020 (ECF No. 138).   The following constitutes the court's findings of fact and conclusions of law under Rule 52, applicable under Rules 7052 and 9014.

## II. JURISDICTION

The United States District Court for the Western District of Michigan has jurisdiction over the Debtor's chapter 12 case and has referred the case to the United States Bankruptcy Court pursuant to 28 U.S.C. § 157(a) and W.D. Mich. LGenR. 3.1(a). GreenStone's Motions are "core proceedings" under 28 U.S.C. § 157(b)(2)(A) and

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.  In addition, the court will refer to any Federal Rule of Bankruptcy Procedure or Federal Rule of Civil Procedure simply as "Rule ___," relying on the numbering convention for each set of rules to signal the intended reference.

(b)(2)(O). The court has authority to enter a final order subject to appellate review under 28 U.S.C. § 158(a).

## III.  ANALYSIS

Although GreenStone filed three Motions, they all arise from GreenStone's belief that the Debtor is not eligible for relief under chapter 12 either because he does not qualify as a "family farmer with regular income" or because he filed (and is prosecuting) this case in bad faith.

To understand the challenge, some preliminary background information about the Debtor's life as a farmer would be helpful.

A.      *Factual Background*

Steven Vander Hoff was a dairy farmer from 1990 through late 2018 or early 2019, and worked with other family members through an entity known as Vander Hoff Bros. Dairy, L.L.C. (the "Dairy").  The Dairy financed its operations through GreenStone as memorialized in eight loans and related loan documents.  Sometime in early 2018, GreenStone came to believe that the Debtor, through the Dairy, sold encumbered livestock without GreenStone's consent in violation of the loan documents, and failed to pay real property taxes, contrary to the mortgages.  *See* Exh. A (Letter from Michael O'Neil to Vander Hoff Bros. Dairy, L.L.C. dated April 24, 2018).

The non-monetary default, however, did not prompt GreenStone to accelerate the indebtedness; instead, the lender enforced restrictions on the sale of collateral in the ordinary course of business (other than milk), making all non-milk sales subject to the lender's written consent, and requiring that any checks representing proceeds of collateral take the form of "two party" checks naming the seller and GreenStone as a payee.  With

respect to milk sales, GreenStone notified the buyer who was purchasing the Debtor's milk, National Farmer Organization ("NFO"), that it should pay GreenStone directly rather than the Dairy or the Debtor, under M.C.L. § 440.9607.

After receiving the April 24 letter, the Debtor and the Dairy sold cattle under the new restrictions, arranging on at least four occasions to take payment in the form of two-party checks.  *See* Exh. I.  Copies of the checks included in Exh. I bear the endorsement of the Debtor and GreenStone, usually indicated by an employee's signing "GreenStone FCS, by" before the employee's name or initials.

With respect to milk sales, starting in May 2018, as the proceeds made their way to GreenStone, GreenStone would apply them to the borrower's payment obligations before returning the surplus for use in running the Dairy.  From May to July 2018, GreenStone applied approximately $175,000 to reduce the debt, and returned approximately $105,000 to the Dairy.  According to the Debtor, these collection efforts had the effect of reducing the Dairy's (and the Debtor's) cash flow, making it difficult to feed and maintain the herd.

Mr. Krummen testified that GreenStone would have entertained written requests for additional financing, as it evidently did in August, 2018, when it entered into a "collateral swap" or "land for livestock" arrangement pursuant to which the borrowers encumbered land in exchange for the right to keep approximately $50,000 from livestock sales.  *See* Transcript of Hearing Held September 14, 2020 in Grand Rapids, Michigan (ECF No. 137, hereinafter "Tr.") at 106:22-25, 129:19 to 130:11. With GreenStone's approval, the Dairy sold 91 animals for just over $49,000.  The funds were deposited into an account at PNC Bank with two-party checks that GreenStone endorsed.  Tr. at 23:7-22.

As part of its collateral monitoring in the spring and summer of 2018, Mr. Krummen and another GreenStone employee conducted frequent inspections of the herd and required the Debtor to deliver written livestock inventory reports such as those admitted as Exh. D.  Mr. Krummen testified that he and his co-worker would count the cattle in their pens and look at the "dead cow pile" on the premises while comparing the results of their inspection with the Debtor's written inventory reports. Tr. at 43:24 to 43:7. For example, according to the inventory report as of the end of March, 2018, the Dairy maintained a herd of 469 cows (mostly milking, some dry), 277 heifers, and 16 bulls. *See* Exh. D.

GreenStone did not insist on mathematical precision, and if the Debtor's reports and Mr. Krummen's counts were more or less in accord, he and his employer were generally satisfied.  Mr. Krummen did not count the skulls in the dead cow pile but did get within a few feet of it and simply noted the size of the pile which, according to his credible testimony, did not appear to change from the summer through the late fall of 2018.  Tr. at 113:3-19.

During the summer of 2018 the issue of cattle deaths began to take on significance. Although the inventory worksheet for the period ending March 29, 2018, showed no cattle deaths, a month later the report showed that three cows and seven heifers died.  The following month, for the period ending May 2018, the number of dead cows dropped to three, but by the end of June, the number of dead cows as reported on the inventory worksheet increased to eight.  July deaths were about the same (seven deaths according to the Debtor), but deaths in August climbed steeply to twenty-five as reported in the August

2018 worksheet which, unlike the prior month's inventories, was prepared almost a month after the end of the reporting period.

Following the site visits, Mr. Krummen would send a letter summarizing GreenStone's concerns and the issues confronting the lender and the obligors. *See* Exh. A, Y, Z, and AA (letters from Eric Krummen to obligors dated July 17, 2018, July 31, 2018, September 26, 2018, and October 15, 2018). For example, the July 17, 2018 letter addressed the issue of pneumonia-related deaths of ten calves, indicating that "all livestock in the lower calf barn have been treated with there being no additional signs of sickness." (Exh. X). Mr. Krummen's July 31, 2018 letter shows no concern about the health or mortality of the herd. The record does not include similar correspondence relating to an August inspection, but Mr. Krummen's September 26, 2018 letter, which summarized the September 25 site visit, raised the "variance" between the number of cows listed on the July and August reports, noting the loss of twenty-two cows and sixteen young stock.

B.      *The Debtor's Prepetition Bad Faith*

Starting in September 2018, however, the Debtor ceased sending the inventory report worksheets, and GreenStone's cattle inspections started to show a decline in the number of cows within its collateral package. Mr. Krummen inquired about the losses and the Debtor evidently blamed the decrease on cattle deaths. GreenStone requested documentation to support the reported deaths, including photographs, but the Debtor did not timely supply the photographic evidence, nor did he submit the inventory worksheets for the months after August. The Debtor testified that he stopped submitting livestock inventories because the death loss was so high, and he was too busy trying to keep everything going. He did not offer, however, any documentary evidence at the hearing to

support his contention that the deaths accelerated after August 2018, or even that the herd was suffering from disease, such as veterinary invoices, photographs, or other records. The only evidence in the record suggesting the dramatic increase in cattle deaths is the Debtor's own testimony, including his implication that whatever cattle died were added to the dead cow pile. Tr. at 137:16-17; 163:24 to 164:3. From Exh. C, the court finds that the Dairy had 780 head of livestock as of July 30, 2018. GreenStone's Exh. E shows that the lender received the proceeds of the sale of 452 head of cattle from August 17, 2018 through the last sale in February 2019 -- a difference of 328 animals. The Debtor's testimony that cattle deaths account for this discrepancy is not credible, given the absence of documentary evidence of disease or other herd distress, and given Mr. Krummen's credible testimony that the dead cow pile, where the Debtor said he deposited the carcasses, did not grow over time. Common sense requires the court to reject the Debtor's explanation because Mr. Krummen and his associates certainly would have noticed the expansion of the dead cow pile if, as the Debtor contends, he added over 300 cows to the heap in just a few months, several in cold weather.[2]

Moreover, GreenStone offered into evidence several checks, from KO Cattle LLC to Stephen Vander Hoff, dating from August to September 2018, in the aggregate amount of $9,000, and one from Jonas and Esther Eicher to Steven Vander Hoff for $750, which GreenStone contends represented proceeds of unauthorized cattle sales. In his direct examination, the Debtor testified that the KO Cattle LLC checks were for "loans," although he did not elaborate or offer any documentation to support his contention. He also testified

---

[2] The court acknowledges that evidence of increasing "somatic cell counts" likely bears on the health of the herd, but without an explanation of the meaning or severity of such counts, the court is unable to draw a definitive link between somatic cell counts and herd mortality.

that the Eicher check, which includes the word "calves" in the memo line, was actually payment for cows that his brother, John, sold to the Eichers and that the Debtor simply delivered. Again, the Debtor did not offer any documentation of the supposed sale from his brother to the Eichers and did not adequately explain why the Eichers would make him the payee on a check representing proceeds of the sale of his brother's cows. If he delivered the cows for his brother, he certainly could have delivered the check to him. The court did not credit the Debtor's testimony about the checks included within Exh. R and infers, based on the name of the payor (with respect to the KO Cattle LLC checks) and the memo line (with respect to the Eicher checks), that the checks likely represent unauthorized sales of GreenStone's collateral.

Adding insult to injury, around the same time that GreenStone became concerned about the number of unaccounted-for livestock, the two milk checks per month that NFO had previously been submitting to the lender abruptly ceased. Effective October 1, 2018, NFO stopped buying milk from the Dairy apparently due to concerns about quality. This prompted the Dairy to sell its raw milk to Tri-State Dairy ("Tri-State"). Because Tri-State was not initially aware of the restrictions on milk proceeds that GreenStone had imposed (*i.e.*, it was probably unaware of the two-party check arrangement that gave GreenStone control of the proceeds of its collateral), milk sale proceeds for approximately a month and half found their way directly into the Dairy's bank account, thereby defeating GreenStone's requirements as expressed in the April 24 default letter. GreenStone eventually learned of this change in sales from NFO, and on November 14, 2018, sent an account debtor letter to Tri-State under M.C.L. § 440.9607, directing Tri-State to remit payments to GreenStone. *See* Exh. B. According to Mr. Krummen, Tri-State ignored the request, effectively

permitting the Debtor and the Dairy to divert approximately $40,000 of GreenStone's proceeds away from GreenStone, contrary to the Debtor's post-default obligations under the loan documents. Tr. at 63:17 to 65:1 (referring to the $40,000 based on summary of checking account activity).

The Debtor attempted through his testimony to blunt the impact of the diversion of milk proceeds after Tri-State began purchasing the Dairy's milk by suggesting, implausibly, that NFO unilaterally substituted Tri-State as the new buyer and implying that the Dairy and the Debtor were unaware of the new procedure. The court finds this testimony incredible. It is certainly possible that someone from NFO sought to soften the blow of its rejection of the Dairy's product by suggesting an alternative buyer, but there is nothing in the record to suggest that NFO had the contractual right, authority, or even market power to foist a new buyer on the Dairy. There is no documented assignment or other indication that NFO and Tri-State are related, but it does not really matter: even if Tri-State was unaware of GreenStone's exercise of its right to collect the Dairy's receivables, or if Tri-State simply ignored those rights, the Debtor was obviously aware and yet had no difficulty diverting the collateral away from GreenStone in violation of his obligations under his agreements and state law.

The court makes a similar observation with respect to the allegedly forged endorsement on the $23,585.20 check from Cargill Meat Solutions Corp., included as part of Exh. H. Mr. Krummen's testimony in his affidavit of February 18, 2020 (admitted as part of Exh. H without objection), established that GreenStone did not endorse Cargill's $23,585.20 check or authorize anyone else to do so. The court notes, too, that the supposed endorsement on that check differs from the endorsements on other two party checks

included in the record because it omits the name or initials of a GreenStone employee who (it is supposed) endorsed it as agent. These irregularities certainly suggest misconduct. Although the Debtor unequivocally denied that he forged GreenStone's endorsement, he offered no explanation of the circumstances surrounding his negotiation of the check, despite the court's invitation.[3] Regardless of whether the Debtor himself forged GreenStone's endorsement, it is crystal-clear that he negotiated the instrument, and he did so knowing since April that keeping the funds violated GreenStone's instructions and rights under the loan documents. Forgery or no, it is easy (and sufficient) to regard the Debtor's negotiation of the check and the retention of its proceeds as illustrative of his dishonesty in dealing with this creditor.

The cessation of inventory reports together with GreenStone's concerns about unauthorized sales of its collateral (concerns that prompted the April 24 default letter in the first place) put a strain on the parties' relationship. The parties started talking about liquidating the entire herd through an orderly winddown of the Dairy's operation, and they agreed that it should be accomplished by the end of December 2018, as set forth in the April 24 default letter and, ultimately, Forbearance and Deed in Lieu Agreement dated December 12, 2018 (Exh. F, the "Forbearance Agreement"). They agreed that GreenStone would use either direct payment of milk checks or two-party checks to capture the proceeds, yet the Debtor actively undermined that arrangement despite benefitting from GreenStone's forbearance from accelerating the indebtedness, seizing tangible collateral, and filing suit.

---

[3] During the hearing, the court made clear that it would not consider the Debtor's affidavit dated September 10, 2020 (ECF No. 136) to be included in the record of the dismissal hearing unless he formally sought its admission. Tr. at 165:6 to 168:6. Rather than do so, the Debtor simply relied on his own rather abbreviated direct testimony.

GreenStone also introduced evidence of the Debtor's unorthodox banking practices and use of funds in a manner inconsistent with the lender's and taxing authorities' rights under the loan documents and applicable law.  For example, Exh. II, a summary exhibit based on the Debtor's use of the Century Bank & Trust ("CBT") account ending in 3660, shows the Debtor's propensity to use the funds that GreenStone returned to him ostensibly to operate the Dairy for his personal purposes.  Indeed, Exh. II and KK demonstrate that the Debtor diverted a considerable sum of money into the account of Rachel Mauk (the Debtor's domestic partner and the mother of his three-year old daughter), using some of the funds for personal purposes and some for business expenses.  The Debtor explained, matter-of-factly, that he funneled funds through Ms. Mauk's accounts because the Dairy's other accounts were subject to tax garnishments.  *See* Tr. at 150:12 to 151:12.  In other words, he admitted taking steps to defeat the rights of the Michigan Treasury Department, hardly the actions of an honest but unfortunate debtor.

In a related illustration of the Debtor's prepetition bad faith, Mr. Krummen pointed to the Debtor's abuse of an accommodation that GreenStone made to assist him in getting square with the IRS.  In a nutshell, although the Debtor and the Dairy owed GreenStone in excess of $2 million, GreenStone nevertheless agreed to carve out of its collateral $90,000.00 to be used "for payment of Stephen's IRS debt and Obligors' attorney."  *See* Forbearance Agreement (Exh. F) at ¶ 1(a) (enumerating debt under eight loans) and ¶ 6(m) (authorizing payment of Debtor's IRS debt and attorney's fee).  Mr. Krummen testified, without contradiction, that contrary to his agreement, the Debtor did not use the carve out to pay the IRS, except for approximately $5,000.  *See* Exh. BB; Exh. II; Tr. at 58:16 to 59:22.  The summaries of bank records (Exh. II and Exh. KK) show that the $90,000 made

a circuitous journey from the closing table, to the Dairy's account, then promptly to Ms. Mauk's bank account, at which point the funds splintered into a combination of personal expenses, counsel fees, and farm expenses. The bulk of the expenses, however, appeared to be personal (although the summary exhibits do not permit precise calculation). Regardless, it plainly appears that the Debtor reached accord with GreenStone to address his own tax liability and related tax lien, but promptly and with subterfuge involving Ms. Mauk's accounts, reneged. The court acknowledges that standing alone a breach of contract, including a forbearance agreement, will not doom a debtor's bankruptcy proceeding, but viewed in context, the breach becomes just another piece in a puzzle of deceptive financial behavior.

C.      *Misconduct in Connection with the Chapter 12 Case*

GreenStone argues that the Debtor's bad faith is not limited to the time leading up to the Forbearance Agreement or even prepetition, but that it continued in connection with the case. The court agrees.

First, GreenStone points the court to two prepetition transfers made shortly before the Debtor filed his case, but that he omitted from his original Statement of Financial Affairs (ECF No. 14, the "SOFA"). More specifically, according to the Debtor's testimony, he transferred two automobiles to his son, Chandler, on the eve of bankruptcy: a 2008 BMW 550i and a 2003 Ford Mustang. *See* Tr. at 146:5 to 150:11. In his testimony, the Debtor explained that he always regarded the Mustang as belonging to his son, but he titled it in his own name for insurance reasons and because his son was a minor when the Mustang was acquired. According to the Debtor, his son decided to sell the Mustang -- curiously, within about two weeks before the Debtor filed his voluntary petition.

Purportedly to accommodate the  sale of the Mustang, the Debtor transferred the title to his son. The Debtor, however, failed to disclose the transfer on his SOFA, until recently.[4]  He explained during the hearing that he never regarded the vehicle as his own.

Perhaps, in isolation, the omission of the transfer of the Mustang to a teenage son could be explained as the inadvertent non-disclosure of a family matter, but the Debtor would also have the court believe that he also always intended to transfer the BMW  to his son as well, and that this transfer of a second car was on account of his son's 18th birthday or graduation,[5] again within two weeks of the bankruptcy filing.  Even though the vehicle may be high mileage, low value, and in need of repair, as the Debtor argued, debtors still have a duty to disclose all assets, including those they believe to be "worthless or … unavailable to the bankruptcy estate." *United States v. Kurlemann*, 736 F.3d 439, 451 (6th Cir. 2013).  Yet, he asks the court to believe that it did not occur to him to mention the transfer of two vehicles to his 18 year old son within the previous fortnight even after consulting with his seasoned bankruptcy attorney in preparing the SOFA, which specifically asks about gifts and recent transfers.

This supposed explanation about the BMW is harder to swallow than the proffered reasons for transferring the Mustang for a number of reasons, aside from its place in a discernable pattern of prepetition anti-creditor conduct.  For example, the vanity plate that adorned the BMW -- "GOTCOWZ" -- seems less suited to a teenager's car, and more suited to a dairy farmer's vehicle -- at least a BMW-driving dairy farmer.  Moreover, the

---

[4] The Debtor amended his SOFA on September 11, 2020 (ECF No. 135), just three days before the evidentiary hearing on the Motions, characterizing the gratuitous transfers as gifts.

[5] The Debtor equivocated on this point.  *See* Tr. at 150:10-11 ("[T]he BMW I promised him after his birthday. Graduation.  Same thing.").

timing of the transfer, while the Debtor was substantially indebted to GreenStone (and others) and as he almost certainly was preparing to file for relief under chapter 12, raises not just an eyebrow, but also several badges of fraud.  The fact that he transferred the BMW to an insider (his son), that it remains parked in his driveway, and that he continues to use it after the transfer (including driving it to the Rule 2004 examination taken in connection with the Motions), are just more classic badges of fraud.  The Debtor is represented by experienced bankruptcy counsel who enjoys a reputation for candor with the court, making an innocent omission unlikely.  The court regards the omission of the BMW transfer from the SOFA as deliberate and fraudulent, and certainly not cured by the recent amendment. *See, e.g., Kohut v. Wandrie (In re Wandrie)*, 563 B.R. 238 (Bankr. E.D. Mich. 2017) (court finds nothing favorable in debtor's attempt to begin to come clean just prior to hearing held more than a month after she filed her petition, schedules and SOFA).

In a similar vein, GreenStone introduced copies of checks from CERES Solutions to the Debtor (Exh. Q and Exh. LL) which the Debtor conceded represent dividends on account of his ownership of shares in a farm cooperative.  The Debtor also omitted ownership of the shares from his schedules, even though he received at least one post-petition dividend check.

The court might regard one or two promptly corrected omissions from a debtor's schedules and statements as innocent but the record of the Debtor's prepetition machinations straddling the petition date shows a pattern of behavior -- a "totality of circumstances" in the language of the cases -- compelling the conclusion that this debtor is not proceeding in good faith.

GreenStone also points to the Debtor's post-petition monthly financial reporting and cash handling as another indication of bad faith. A chapter 12 debtor is a "debtor in possession," § 1203, with reporting obligations borrowed from those that apply to a chapter 11 debtor in possession. Fed. R. Bankr. P. 2015(b). Although GreenStone offered no evidence of the instructions that the Trustee or the United States Trustee may have given the Debtor at the first meeting of creditors or initial debtor interview, the Debtor's testimony established that he was aware of his reporting obligations and obligation to use a "debtor in possession" or "DIP" account -- a fiduciary account identified as such. His testimony and several exhibits established that he did not take these obligations seriously. Although he did establish a DIP account at CBT, he failed to attach account statements to his monthly operating reports. He testified that he was unaware of this requirement. Tr. at 145:21-25. After CBT closed the DIP account in March of this year in response to GreenStone's inquiry about the allegedly forged $23,585.20 check, the Debtor neglected to open a new DIP checking account until shortly before the hearing. He testified that he established the replacement DIP account at County National Bank in Hudson, Michigan approximately six months after CBT closed the original DIP account. In the meantime, he evidently used cash and another (personal) deposit account at County National Bank for estate funds. Tr. at 144:11 to 145:15.

His monthly operating reports, which he filed sporadically during the case, consisted in perfunctory, frequently handwritten notations, occasionally revealing farm-related transactions (e.g., manure hauling and corn sileage for other farmers) but mainly ordinary household expenses. *See* Exh. JJ. The court infers that the Debtor's prepetition

predilection for using cash continued postpetition, making the DIP financial reporting less than complete, less than helpful, and probably less than honest.

D.      *Challenge to Eligibility as Family Farmer With Regular Income*

GreenStone stipulated that the Debtor met the definition of "family farmer" within the meaning of § 101(18)(A), based on the proportion of income he derived from farming prepetition, but alleges that he does not qualify as a "*family farmer with regular income*" as required for eligibility under § 109(f).

The italicized phrase means a "family farmer whose annual income is sufficiently stable and regular to enable such family farmer to make payments under a plan under chapter 12 of this title." 11 U.S.C. § 101(19). GreenStone has expressed doubt that the Debtor is currently farming, likely because of the dramatic shift in the Debtor's circumstances. He went from running a substantial dairy farm with eight hundred head of cattle to growing a few varieties of squash and pumpkins on less than forty acres. The court's reading of the statutory definitions and case law bearing on eligibility, however, confirms that Congress anticipated such changes and sought to permit those engaged in farming to continue the agricultural lifestyle, even in the face of interruptions and dramatic shifts, as the Debtor's case illustrates. With respect to his current farming activity, the record shows that the Debtor paid "the Amish" $100 to plant pumpkin seeds (Tr. 142:2-3; Exh. JJ), recently dusted the plants with a pesticide (Tr. 142:21-22), and harvested a few pumpkins, perhaps prematurely in his view (Tr. at 138:7-18). Although the record suggests the Debtor may be pursuing an avocation rather than agriculture, the limited operation is probably sufficient to qualify him as a "family farmer," applying a liberal gloss in light of the policies undergirding chapter 12. *In re Howard*, 212 B.R. 864 (Bankr. E.D. Tenn.

1997) (debtors are family farmers even though they rely on labor and assets of emancipated children); *In re Voelker*, 123 B.R. 749 (Bankr. E.D. Mich. 1990) (debtor met the definition of "family farmer" even though he did not own the farm but only operated it); *In re Welch*, 74 B.R. 401 (Bankr. S.D. Ohio 1987) (debtors were family farmers even though they "farmed out" some of their milking and much of their grain production). The next question is whether he meets the definition of a "family farmer with regular income."

The only evidence of the Debtor's income was his testimony that he is unemployed and received some unemployment benefits during the COVID 19 public health emergency. Without documents or more specific testimony from him or Ms. Mauk (who is contributing the lion's share of plan payments), it is impossible to conclude by a preponderance of the evidence that the Debtor has "regular income" from any source, let alone from farm operations or income that is sufficiently stable and regular to enable him to make payments under a plan. *See* 11 U.S.C. § 101(19). The following exchange from the Debtor's surprisingly brief direct examination is telling:

> Q:    If we go forward with this Chapter 12, do you now have an income that is regular and sufficient to fund the plan that's been proposed?
>
> A:    Yes. Between -- now, this -- right now, I have the crops and started harvesting. So that's one part of the plan that is actually working well. And I do have some work lined up. You know, I've been constantly filling in in different farms, whether it's with harvesting or this or that. But I plan on, after I get the crops off, I hopefully have a full-time job lined up.

Tr. at 138:4-13. He offered nothing specific in terms of the amount of his income or the regularity. Indeed, on cross examination, GreenStone's counsel asked the Debtor about the source of his monthly income and he responded, "I was on unemployment with the

COVID situation, but currently from the sale of produce." Tr. at 139:14-16; 140:24 to 141:6.

The Debtor confirmed that from January 2019 until about August 2020, he worked as a farm laborer on the farms of other people, but again offered nothing specific in terms of dollar amounts or frequency of payments that would even permit an inference that he has regular income. He relies heavily on the contributions of non-debtor Rachel Mauk to make up the monthly shortfall in his budget, yet he concedes that she has no legal obligation to assist in making plan payments. Tr. at 156:5-21. The Debtor did not offer any testimony from Ms. Mauk at the hearing, leaving the court to speculate about her willingness or ability to contribute, even assuming her income is his.

Based on the record developed during the hearing, the court finds that the Debtor failed to meet his burden of establishing eligibility, warranting dismissal on this aspect of GreenStone's first two dismissal motions, ECF Nos. 56 and 65.

On the question of "cause" for dismissal under § 1208, GreenStone proved by a preponderance of the evidence a "totality of circumstances" amounting to cause including the Debtor's efforts to defeat the rights of his creditors by failing to account for cattle in late 2018, presenting a dubiously endorsed two-party check for negotiation, by employing unorthodox banking practices through Ms. Mauk's deposit accounts, by failing to disclose two automobile transfers to his son on the eve of filing the chapter 12 petition, by omitting his ownership interest in a farm cooperative known as CERES Solutions, and by adopting an unjustifiably cavalier approach to his reporting obligations as a debtor in possession under Rule 2015.

The bankruptcy court has long been recognized as a refuge for the financially distressed, and with appropriate supervision the relief it offers is available to the "honest but unfortunate debtor." The Debtor may meet the latter description, but he does not meet the former. His prepetition and post-petition bad faith disqualify him. *Marrama v. Citizens Bank*, 549 U.S. 365, 374 (2007) (a finding of prepetition bad-faith conduct is tantamount to a ruling that the individual does not qualify as a debtor); *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (bankruptcy law protects the "honest but unfortunate debtor"); *Alt v. United States (In re Alt)*, 305 F.3d 413, 419 (6th Cir. 2002) (chapter 13 debtor's bad faith, considering "totality of the circumstances" including debtor's treatment of creditors both before and after the petition was filed, justified dismissal of petition). The bankruptcy court will not shield debtors, even farmers, who fail to deal honestly with their creditors.

The totality of the circumstances established during the hearing amount to cause for dismissal under § 1208. As noted above, in this unusual situation involving "fraud in connection with the case," the court must consider whether conversion or dismissal is warranted. 11 U.S.C. § 1208(d).

Although the third dismissal motion explicitly cited § 1208(d), GreenStone's counsel did not advocate for conversion during the hearing. When asked whether the court should convert or dismiss, counsel expressed no preference for conversion, and neither did the IRS or the Trustee. The United States Trustee did not participate, and therefore offered no advice on the question.

Although the testimony and documents suggested several possible avoidance actions that a chapter 7 trustee could pursue upon conversion, the court believes that suing the Debtor's girlfriend and his son is probably not cost-effective given GreenStone's head

start in collecting its judgment against Ms. Mauk and the testimony regarding the son's further transfer of the Mustang, as well as the age and condition of the BMW.  Moreover, it is highly unlikely that a chapter 7 trustee would have, or be willing to secure, funding to pursue the avoidance actions that, as just noted, would likely amount to a fool's errand, anyway.  Finally, dismissal rather than conversion could afford the Debtor a better opportunity to pursue relief under title 11 if he later elects to play it straight with his creditors and the court.  The court, therefore, will dismiss, rather than convert the case, deferring to GreenStone as the Debtor's largest and most active creditor.

## IV.  CONCLUSION

During closing arguments, the Debtor's counsel repeatedly referred to his client's desperation at losing the farm to justify the "creative" efforts to keep the farm running -- efforts such as selling collateral out of trust, shifting money from an obligor's account to the account of a non-obligor to defeat garnishment writs, making gratuitous transfers to an insider on the eve of bankruptcy and omitting the transactions from schedules.  The court has no doubt that debtors facing the circumstances that this long-time dairy farmer faced would feel desperate, but in the court's experience most do not respond to desperation as Mr. Vander Hoff did.  The Bankruptcy Code certainly protects the desperate, but the duplicitous must fend for themselves.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1.      The Motions are GRANTED and the case is DISMISSED;

2.      Any further stay of proceedings is hereby terminated as to the Debtor, property of the Debtor, and former property of the estate; and

3.      Chapter 12 trustee Marcia Meoli shall promptly file her final report and account.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Memorandum of Decision and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon the Debtor, the United States Trustee (by first class U.S. Mail), John Polderman, Esq., Marcia Meoli, Esq., Daniel L. Kraft, Esq., Michael Shiparski, Esq., Elizabeth Abood-Carroll, Esq., and all entities listed on the mailing matrix for this matter.

END OF ORDER

**IT IS SO ORDERED.**



**Dated October 1, 2020**

Scott W. Dales
United States Bankruptcy Judge